WEIMER, J.,
concurring.
|,The opinion articulates the correct legal standards to apply to this vexatious dispute between neighbors. Both explicit permission and tacit permission deriving from acts of “good neighborhood” by an owner can defeat the claim of someone who contends he benefits from adverse possession so as to acquire a servitude of passage upon the owner’s property. Boudreaux v. Cummings, No. 14-1499, slip op. at 7 (La.3/17/15). Given the legal standards, I write to emphasize certain facts. Most notably, I respectfully disagree with the dismissal by both the opinion and the dissents of certain extensive record evidence regarding the placement of the gate. The sole basis for rejecting the record evidence of collaboration in the placement of the gate is the view that such collaboration is not dispositive of Mr. Boudreaux’s status as a permissive user because the collaboration could just as easily be interpreted as evidence that Mr. Boudreaux, as owner of the right of way and of the dominant estate, was merely fulfilling his codal obligation of accommodating the ser-vient estate. See, La. C.C. art. 748. However, while the interactions between Mr. *569 Boudreaux and Mr. Weill during this episode may be consistent with what the Civil Code would require if Mr. Boudreaux actually owned a right of passage across Mr. Weill’s property, the | ¿fact is that a right of passage is a discontinuous apparent predial servitude and Louisiana did not provide for acquisitive prescription of this right until the 1977 revision of Louisiana Civil Code article 740 went into effect on January 1, 1978. See, La. C.C. art. 740, Revision Comments (a). Because Mr. Bou-dreaux’s possession of the right of passage could not have begun to become effective until 1978, his actions in 1969 with respect to the placement of the gate simply could not be interpreted as evidence of Mr. Bou-dreaux’s intent to possess as owner. In other words, Mr. Boudreaux cannot avail himself of the presumption that his possession of the passageway was with the intent to possess as owner at a time when the law did not allow him to acquire a servitude of passage by acquisitive prescription.
Far from being irrelevant and non-dis-positive, I find the record evidence regarding the collaborative nature of the gate’s placement, its construction, and its later use to be direct and relevant evidence that Mr. Boudreaux used the passageway with “permission” as required by La. C.C. art. 3437, regardless of whether that evidence was adduced on direct or cross examination.[1] Further, I find that the evidence of neighborly acts on the part of the successive property owners (Mr. Weill and Mr. Cummings) effectively rebuts any presumption that might otherwise arise from the fact of Mr. Boudreaux’s possession, notwithstanding Mr. Boudreaux’s self-serving protestation of his clandestine intent to possess as owner.
|sMr. Boudreaux testified that when he moved to the property in 1969, he “rebuilt the fence.” Mr. Boudreaux admitted much more than the rebuilding of the fence was accomplished because he worked collaboratively with the landowner:
Me and Mr. Bob Weill [Cummings’ ancestor in title] got together, and the fence was in bad repair, and he allowed me to clear some trees on him and on me and to rebuild the fence, which he gave me part of the material to help me build the fence. And he also asked me to move the gate a little further to the east, toward the end of his property closer to the river, which I did.
Presumably, the clearing of trees “on him” and “on me” referred to clearing trees on Mr. Weill’s land and on Mr. Bou-dreaux’s land, respectively. In any event, the quoted testimony indicates that establishing a passageway in 1969 was a collaborative effort between Mr. Boudreaux and Mr. Weill because Mr. Weill even supplied materials. Thus, because this gated access point was established in 1969 and the passage beyond the gate has remained there to this day, the circumstances of its establishment were collaborative and, therefore, indicative of both permission[2] and acts of *570 “good neighborhood,” rather than of adverse possession.
Physical possession of a thing, such as land, the Civil Code informs us, involves as a general proposition “physical acts of use, detention, or enjoyment over a thing.” La. C.C. art. 3425. More specifically, for purposes of acquisitive prescription as claimed by Mr. Boudreaux here, “[t]he possession must be continuous, uninterrupted, peaceable, public, and unequivocal.” La. C.C. art. 3476 (applicable to prescription of ten years in good faith and under just title) (emphasis added); see also La. C.C. art. 3488 (generally rendering the “rules governing acquisitive prescription of ten years applicable] to the prescription of thirty years”). The Code |4further emphasizes that “[possession that is .... equivocal has no effect,” (La. C.C. art. 3435) and “[pjossession is ... equivocal when there is ambiguity as to the intent of the possessor to own the thing.” La. C.C. art. 3436.
The facts recounted above about the origin of the passageway between the Weill and Boudreaux properties indicate the passageway was constructed with the permission of Mr. Weill, at a place designated by Mr. Weill, and even with some materials supplied by Mr. Weill. Given these facts, Mr. Boudreaux’s possession was, at best, equivocal. As to this point, Comment (e) to La. C.C. art. 3476 dispels any doubt: “The exercise of possession over a thing with the permission of ... the owner ... is precarious possession.” (Emphasis added.) Precarious possession defeats the possibility of acquiring a servitude through acquisitive prescription: “Acquisitive prescription does not run in favor of a precarious possessor-” La. C.C. art. 3477.
Therefore, Mr. Boudreaux’s possession began as precarious possession because it originated from Mr. Weill’s consent. The record reflects no change in the permissive nature of Mr. Boudreaux’s use of the passageway. Indeed, by Mr. Boudreaux’s own admission, the passageway continued' to be used by explicit permission and as an act of “good neighborhood” on behalf of Mr. Weill, as follows.
Mr. Boudreaux testified to having used the passageway to “bring tractors and combines across there and harvest my rice.” Significantly, Mr. Boudreaux also testified using the passageway to assist with farming on Mr. Weill’s property as follows: “I would go back across there when he was harvesting his rice and help him.” In fact, according to Mr. Bou-dreaux, the passageway was used for the benefit of both himself and Mr. Weill, because “the Duhon boys” who harvested Mr. Weill’s land also “harvested my [Mr. Boudreaux’s] crop with their combines.”
|5To reiterate, the opinion utilizes has identified the correct legal standard for evaluating these facts. Explicit permission and tacit permission deriving from acts of “good neighborhood” by an owner can convey no more than equivocal possession (La.C.C. art.-3476) and, in turn, precarious possession gains no foothold for acquisitive prescription. La. C.C. art. 3477. The concept of acquisitive prescription is ancient, and the rationales for preventing permissive and neighborly uses to allow the user to wrest away ownership rights have also been long recognized. As Planiol noted:
The Ancients said of prescription that it was the patroness of the human species .... Acquisitive prescription ... plays an important social role. Without it no patrimony would be safe from un *571 foreseen revindications. It is certain that there are times when prescription may avail a possessor without title and in bad faith. It would then afford a shield to a spoliator. But such instances are of rare occurrence. And it would happen even more infrequently that the owner despoiled through prescription had not been guilty of negligence. Why did he remain for such a long time without performing an act of possession as regards his thing or without laying claim to it? A sufficient delay is allowed him within which to learn of the usurpation committed against him and in which to protest against it.
M. PlANIOL, TREATISE ON THE ClVIL LAW § 2645 at 571-572 (La.St.L.Inst.Trans. 1959).
Here, Mr. Weill was not “guilty of negligence” in disregarding his property. Id. Nor can it be said Mr. Weill “remain[ed] for such a long time without performing an act of possession as regards his thing or without laying claim to it.” Id. Rather, in the spirit of being a good neighbor, Mr. Weill permitted and even aided Mr. Bou-dreaux in constructing the passageway. As Mr. Boudreaux admitted, rather than being used adversely, the passageway was frequently used as a means for maintaining good relations between the adjacent property owners:
Q. [Cummings’ counsel] You considered yourself a good neighbor of the Weills?
|fiA. [Mr. Boudreaux] We always got along well with the Weills.
Q. And Mr. Weill would have thought the same, you think, of you?
A. Yes. He and his wife came drink [sic] coffee often.
[[Image here]]
Q. [Boudreaux’s counsel] When the Weills came drink [sic] coffee at your house,, how did they get to your house?
A. [Mr. Boudreaux] Sometimes-sometimes they actually walked. Because Mr. Weill and his wife liked to exercise, and they would walk a lot. Sometimes they would park on the right of way and walk, and sometimes they would come down the public road.
Q. Did they pass through that gate that you were talking about?
A. Sometimes they did, yes.
Our venerable Civil Code generally encourages moral conduct and deters immoral conduct. Consider the consequences of a determination that one is engaged in a bad-faith breach of an obligation[3] or is a bad-faith seller in a redhibition action.[4] The Civil Code increases damages in those situations.[5] The law of lesion beyond moiety reflects a moral component by protecting a seller of an immovable from falling *572 prey to a buyer whose price is out of line with certain market standards.[6] The denial of spousal support to one who is at fault for the demise of a marriage also has |7a moral component.[7] The Civil Code further reflects a moral component in recognizing natural obligations.[8]
By comparison, the law of acquisitive prescription allows the taking of another’s property even if done in bad faith. Such departure from what could be considered moral conduct exists to serve other societal purposes, including quieting titles to property which has been abandoned and keeping property in production, and reflects a populist philosophy.
To balance what could be perceived a departure from moral underpinnings, the Civil Code mandates that possession be public and unequivocal, not silent and clandestine.[9] See La. C.C. arts. 3435 and 3436.
The Civil Code does not contemplate depriving an owner of full enjoyment of property simply because the owner has acted as a good neighbor in allowing use of the property. Had Mr. Boudreaux wished to depart from the neighborly use allowed him by Mr. Weill and by Mr. Cummings, the Civil Code afforded him such a procedure. Under La. C.C. art. 3478, a “precarious possessor, or his universal successor, may commence to prescribe when he gives actual notice to the person on whose behalf he is possessing that he intends to possess for himself.” Mr. Boudreaux adduced no evidence of having given such notice to Mr. Weill. Mr. Boudreaux did 18not unequivocally manifest an intent to possess, as owner, the passageway on Mr. Weill’s land, either when sharing a neighborly cup of coffee or in a more conspicuous setting.
In conclusion, from my review of the relevant Codal articles and of the principles on which those articles are based, I find the adage that “no good deed goes unpunished” has yet to be incorporated into Louisiana’s law of acquisitive prescription. Allowing a neighborly use of one’s property is instead encouraged by the Civil Code, which does not deprive an owner of a property right for having acted as a good neighbor. Thus, I respectfully concur.
HUGHES, J., dissents for the reasons assigned by KNOLL, J. and CRICHTON, J.

. In England and in about one-fifth of the states, cross-examination is wide open. Louisiana follows the wide open rule of cross-examination. ...
Under the rule that permits cross-examination on all issues in the case, the right of a thorough and sifting cross-examination, which belongs to every party as to the witnesses against him, is especially applicable where the witness is the opposite party to the cause on trial who has testified for the purpose of making out his own case.
Eldon E. Fallon, Louisiana Practice Trial Handbook for Louisiana Lawyers § 17:2 (3d ed.2007) (footnote omitted; emphasis added).
It is axiomatic, therefore, that in our de novo review, we can consider evidence adduced during both direct and cross-examination when applying the facts to the law.

. Although the opinion correctly applies a de novo review, I note the trial court aptly ob *570 served: "So I think that the fact that the Weills and Mr. Cummings and everyone along the way permitted this is exactly what happened.”

. "An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform.” La. C.C. art. 1997.

. La. C.C. art. 2545, provides, in pertinent part:
A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees.

. Compare La. C.C. art. 1997 with Article 1996 ("An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made.”). Compare La. C.C. art. 2545 with Article 2531 ("A seller who did not know that the thing he sold had a defect is only bound to repair, remedy, or correct the defect.”).

. “The sale of an immovable may be rescinded for lesion when the price is less than one half of the fair market value of the immovable.” La. C.C. art. 2589.

. "When a spouse has not been at fault prior to the filing of a petition for divorce and is in need of support, based on the needs of that party and the ability of the other party to pay, that spouse may be awarded final periodic support....” La. C.C. art. 112(A).

. "A natural obligation arises from circumstances in which the law implies a particular moral duty to render a performance.” La. C.C. art. 1760. "[WJhatever has been freely performed in compliance with a natural obligation may not be reclaimed.” La. C.C. art. 1761.

. Possession which is clandestine within the meaning of La. C.C. arts. 3435 and 3436 is defined in the landmark Dictionary of the Civil Code, translated under the supervision of noted civilian scholars Alain Levasseur and Marie-Eugenie Laporte-Legeais, as a ”[v]ice affecting possession (and constituting an obstacle to acquisitive prescription) when the acts of possession are hidden from those who would have an interest in preventing usuca-pion — acquisitive prescription, from occurring.” Gerard Cornu, Dictionary Of The Civil Code 102 (transí. Alain Levasseur and Marie-Eugenie Laporte-Legeais, LexisNexis 2014).